IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELIZABETH A. STANTON,<br>Personal Representative of<br>JOSEPH H. SANTARLASCI, III,<br>Deceased, and Administrator of the<br>Estate of JOSEPH H. SANTARLASCI, III,<br><br>  Plaintiff,<br><br>v.<br><br>LAFAYETTE COLLEGE, *et al.*,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 02 CV 4779<br>)<br>)<br>)<br>) |

### PLAINTIFF'S OPPOSITION TO MOTION OF
### DEFENDANT LAFAYETTE COLLEGE FOR A PROTECTIVE ORDER

**COMES NOW** Plaintiff, Elizabeth A. Stanton, by and through her undersigned counsel, and Opposes the Motion of Defendant Lafayette College for a protective order, and as grounds therefor, refers to the Memorandum of Law attached hereto and made a part hereof.

          Respectfully submitted,

          */s/ Peter C. Grenier*
          Peter C. Grenier (admitted *pro hac vice*)
          Anne R. Noble (admitted *pro hac vice*)
          BODE & GRENIER. LLP
          1150 Connecticut Avenue NW
          9th Floor
          Washington, DC 20036
          Telephone: (202) 828-4100
          Fax: (202) 828-4130

          *-and-*

Jonathan S. Ziss, Esquire
Jonathan A. Cass, Esquire
SILVERMAN BERNHEIM & VOGEL, P.C.
Two Penn Center Plaza
Philadelphia PA  19102
Telephone: (215) 636-3962
Fax:  (215) 636-3999

*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH A. STANTON,             )
Personal Representative of        )
JOSEPH H. SANTARLASCI, III,       )
Deceased, and Administrator of the )
Estate of JOSEPH H. SANTARLASCI, III, )
                                  )
       Plaintiff,                 )
                                  )
v.                                )  Civil Action No. 02 CV 4779
                                  )
LAFAYETTE COLLEGE, *et al.*,      )
                                  )
       Defendants.                )

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO MOTION OF DEFENDANT LAFAYETTE COLLEGE FOR A PROTECTIVE ORDER

This is a wrongful death and survival action brought against Defendant Lafayette College ("Lafayette" or the "College") and its student/employee, Defendant Erin Malone ("Ms. Malone"), arising from the death of Joseph H. Santarlasci, III ("Jay") in the lap pool of the College's Ruef Natatorium on December 2, 2001. At the time of the drowning, Ms. Malone was assigned to guard the pool and protect its patrons. She did neither. Instead, as Jay lay unconscious at the bottom of lane 4 until the pool became his liquid coffin, Ms. Malone did her homework.

## I.   Factual Background

The lawsuit underlying this Opposition was filed in July 2002. Since December, Plaintiff has been attempting to secure necessary and relevant discovery from the College. Plaintiff's attempts have been almost entirely unsuccessful, however.[1] To date, <u>eight</u> weeks after being served with interrogatories, the College has answered <u>none</u> of them. To date, <u>eight</u> weeks after being served with requests for sixty-three categories of relevant documents, the College has provided just a small pile of unlabeled and, in some cases, otherwise unidentified documents. The College has not served any formal written responses to the Document Requests, and has otherwise failed to comply with Fed. R. Civ. P. 34(b) (procedure for responding to requests for production of documents).[2] While counsel for the College promised delivery of the formal responses to both the Interrogatories and the Document Requests last Friday, inclement weather apparently made this impossible. In any event, to date, no formal responses have been received by Plaintiff.

On January 9, 2003, Plaintiff served on the College her first set of Requests for Admissions. Sometime thereafter, counsel for the College (Jonathan K. Hollin, Esquire) telephoned Plaintiff's counsel, and asked Plaintiff's counsel to "pick" "which hundred" of the Requests Plaintiff's counsel wanted answered. Because <u>each</u> of Plaintiff's Requests was specifically designed "to facilitate proof with respect to issues that cannot

---

[1] Indeed, despite repeated requests from Plaintiff for this information (as well as this Court's mandate during the telephonic scheduling conference), Lafayette College still has not even provided "the address and telephone number of each individual likely to have discoverable information," which information should have been included in its initial disclosures. *See* Fed. R. Civ. P. 26(a)(1)(C). Instead, all it has provided is the names of such individuals.

[2] The cut-off for fact discovery in this case is March 31, 2003.

be eliminated from the case," or "to narrow" the case by eliminating the need for proof of issues that <u>can</u> be eliminated, *see* Fed R. Civ. P. 36 advisory committee's notes, Plaintiff believes that each of the Requests is both proper and necessary, and Plaintiff's counsel, as a result, declined to "pick" and choose from among them. Counsel for Lafayette College did not raise the issue again before filing the Motion for Protective Order ("Motion") now before this Court. The College's Motion should be denied.

## II. <u>Argument</u>

Lafayette College seeks a protective order based on two inconsistent and contradictory theories. First, the College argues (without reference to specific fact) that the Requests for Admission ("Requests") served on it by Plaintiff are allegedly "oppressive" and "burdensome." Motion at 4. If it <u>must</u> respond to the Requests, the College says, it should only be required to answer <u>some</u>. It is therefore not the substance of the Requests to which the College objects, nor the difficulty or complexity of them, but only their <u>number</u>. In and of itself, the College argues, the <u>number</u> of Requests renders them "oppressive" and "burdensome." Next, the College argues that the Requests are not Requests at all, but, instead are "contention interrogatories," and, on this basis, allegedly violate Fed. R. Civ. P. 33.[3] But if this is true, then why, if the College believes the strictures of Fed. R. Civ. P. 33 apply here, did it previously volunteer to answer "100" of them? In fact, the College knows that none of the Requests at issue here are any kind of interrogatory at all, but, instead, are what they purport to be: Requests for Admissions.

Because numerosity alone is not a sufficient basis for a protective order (where, as here, the Requests do not number in the thousands, *see Duncan v. Santaniello*, 1996 WL 121730, *3 (D. Mass. 1996)), and because the Requests here are not "contention interrogatories" dressed up as Requests, and, finally, because requiring the College to admit or deny the Requests "comport[s] with 'the purpose of [Fed. R. Civ. P. 36(a),

---

[3] By standing order, this Court has opted out of Rule 33. *See McMenamin v. M&P Trucking Co., Inc.*, 1994 WL 124846, *2-3 (E.D. Pa.). Thus, the number of permissible interrogatories in this case is, as the Court knows, discretionary with the Court. *Id.* This argument need not be reached in this case, however, because the Requests here do not fit any standard definition of "contention interrogatories" and are not "contention interrogatories."

which is] expediting the trial and [relieving] the parties of the burden and expense of proving at trial facts which are undisputed," *Duncan,* 1996 WL 121730, *1 (*quoting Kershner v. Beloit Corp.*, 106 F.R.D. 498, 499 (D. Me. 1985)), the College's Motion should be denied, and this Court should order the College to respond to the Requests immediately.

### A. The Requests for Admission Here are Neither Oppressive Nor Unduly Burdensome.

Given its track record thus far in this litigation, it appears that, to the College, <u>any and all</u> discovery requests are "oppressive" and "unduly burdensome," and that Plaintiff's honest attempts to obtain relevant discovery in this case -- in fact and <u>in toto</u> -- serve "merely to cause annoyance and undue expense on the part of Lafayette College." Motion for Protective Order at 4.[4] It is not surprising, therefore, that these are exactly the arguments it raises in support of its motion for protection. *See id.*

In fact, Plaintiff's discovery requests thus far in this litigation are not, and have not been, "oppressive" or "unduly burdensome," and the College's boilerplate objections herein should not be rewarded with judicial imprimatur on the relief it seeks. Indeed,

> . . . as the party seeking the protective order, [Defendant has] the burden of demonstrating that 'good cause' exists for the protection of the discovery material. . . . 'Good cause' is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury. . . . Broad allegations of harm, unsubstantiated by specific examples will not suffice.

---

[4] Significantly, while having served <u>two</u> sets of document requests and <u>two</u> sets of interrogatories on Plaintiff, as well as <u>six</u> subpoenas on third parties, the College's responses to Plaintiff's discovery requests thus far have been limited to service of approximately 200 pages of unlabeled documents, sixty-eight pages of which (as the College knew) were already in Plaintiff's possession. Thus, the College (an institution) has requested what amounts to more than 1,000 pages of documents from Plaintiff (an individual), but claims to have no obligation to reciprocate.

*In re Aetna Inc. Securities Litigation*, 1999 WL 354527, *5 (E.D. Pa.) (citations omitted).[5] *Cf. Alexander v. Rizzo*, 50 F.R.D. 374, 375 (E.D. Pa. 1970) (fact that responding to discovery requests allegedly would require "'hundreds of employees of the Police Department many years of man hours'" to complete did not render discovery requests sufficiently "burdensome and oppressive" so as to warrant a protective order given the "obvious necessity of the information sought to be discovered"). *See generally* Fed. R. Civ. P. 36 advisory committee notes (emphasis added) ("The rule as revised adopts the majority view, as in keeping with a basic principle of the discovery rules <u>that a reasonable burden may be imposed on the parties when its discharge will facilitate preparation for trial and ease the trial process</u>").

Indeed, the College's principal argument here appears to be that the <u>number</u> of requests served by the Plaintiff here renders the requests objectionable <u>per se</u>. *See, e.g.,* Motion at 3. Yet, the cases it cites for this proposition do not support its argument. Specifically, the College relies on *Leonard v. University of Delaware*, 1997 WL 158280 (D. Del. 1997) and *Wigler v. Electronic Data Systems Corp.*, 108 F.R.D. 204 (D. Md. 1985). Neither assists its position.

*Leonard* was a decision issued in a long-simmering and rancorous lawsuit brought by a mentally-unbalanced student against the university that had dismissed him from its graduate physical therapy program. At issue in that case were, <u>inter alia</u>, 839 requests for admission Leonard had served on the school, which ranged, as the court stated, from the entirely incomprehensible, *see, e.g., Leonard*, 1997 WL 158280, *5 n.15 (in which the Plaintiff asked the University to admit or deny that: "'The University

---

[5] The *Aetna* case concerned a request for a protective order to restrict disclosure of the identities of certain individuals. It is being cited only for its useful description of the "good cause" standard.

indicated at the 611/620 hearing that had reviewed to lend [*sic*] its grading expertise Leonard's paper for these courses, at Paul Mettler's request, between the date of the two grievance hearings'") to the scatalogical, *see, e.g., id.* (in which the Plaintiff asked the University to admit or deny that: "'In Patient Management 1, the University instructed Leonard to cross paths with Lynn Synder-Mackler because she is a 'bitch'"). Moreover, as the court discovered, the requests had been drafted by Leonard himself, who, after being specifically instructed by the court "to limit and restructure" them, refused to do so.

Here, by contrast, the requests at issue are simple, direct and entirely comprehensible. *See, e.g.,* Requests for Admission at ¶1 ("No Lafayette College employee, agent, or representative removed Jay Santarlasci from the pool at the Ruef Natatorium at Lafayette College"); ¶18 ("Erin Malone was an employee of Lafayette College at the time of the Incident"); ¶206 ("When Jay Santarlasci was removed from the pool, he was unconscious"). Additionally, because in this case <u>seconds mattered</u>, it is entirely appropriate for Plaintiff to ask that the College admit, for example, that Jay Santarlasci "was submerged in the pool for at least 10 minutes" and, additionally, to "ask the same question" eleven more times, each with "a different number of minutes or seconds." *Compare* Motion at 6.

Indeed, Jerome Modell, M.D., Plaintiff's drowning expert, has opined that:

> It should be noted that if the victim had been rescued within three minutes of the onset of submersion, within reasonable medical probability, with appropriate rescue and resuscitation techniques, he would regained spontaneous cardiac activity and, likely, would have survived. Furthermore, if he had been removed from the water within 1 ½ minutes, it is unlikely that he would have aspirated water and he, therefore, would have made an immediate recovery at poolside. If he was removed and appropriate resuscitative techniques were applied between three and five

minutes of the onset of submersion, I would have expected his heartbeat to return. * * * Within reasonable medical probability, the time from onset of submersion to rescue was, at least, five minutes and, more likely ten minutes.

Report of Jerome H. Modell, M.D. (Dec. 30, 2002), a copy of which is attached hereto as Exhibit 1. Plaintiff's principal witness to this tragedy is dead. There is no reason why the <u>College</u> should not have to state, at this point, what it knows (or, alternatively, does not know) regarding the Incident.[6] In truth, it appears that the College simply wants to <u>avoid</u> precision of the facts, which is understandable given the outrageousness of its lifeguard's behavior in failing to monitor the pool for many <u>minutes</u> and then, upon learning of Jay Santarlasci's emergency, running away from the pool, leaving other <u>patrons</u> to rescue Jay's near-dead body, albeit too late to save him from death.

Moreover, if the College lacks information sufficient to admit or deny these requests, or believes they present a genuine issue for trial, it is, of course, <u>appropriate for the College to so state</u>. As the Advisory Committee for the Federal Rules explicitly noted:

> The very purpose of the request is to ascertain whether the answering party is prepared to admit or regards the matter as presenting a genuine issue for trial. In his answer, the party may deny, or he may give as his reason for inability to admit or deny the existence of a genuine issue. The party runs no risk of sanctions if the matter is genuinely in issue, since Rule 37c provides a sanction of costs only when there are no good reasons for a failure to admit.

Fed. R. Civ. P. 36 advisory committee notes.

---

[6] Nor is there any reason why the College should not have to admit (or, alternatively, deny) the substance of its rules and policies for lifeguards on the day of the Incident. *See, e.g.,* Requests 23-45 (concerning Lafayette College rules and policies regarding how often lifeguards were required to "visually scan" the pools in the Ruef Natatorium). If there were no policies, or if the admissions do not reflect the substance of any policies then in existence, then all Lafayette College is required to do is to deny the Requests.

What is <u>not</u> appropriate is the College's unilateral and abject refusal to participate in discovery in this case.

Similarly unhelpful to the College's position is its reliance on *Wigler v. Electronic Data Systems Corp.*, 108 F.R.D. 204 (D. Md. 1985). There – in the context of an employment discrimination suit – the <u>employer</u> (Ross Perot's giant EDS) served on its former <u>employee</u> (in one two-week period) 1,664 requests totaling "370 pages in length, exclusive of attachments numbering more than 300 pages[,]" <u>i.e.</u>, a total of 670 pages. *Id.* at 205 (emphasis added). Here, by contrast, an <u>individual</u> plaintiff has served on an <u>institutional</u> defendant some 691 requests, the responses to which clearly would save "'time, trouble, and expense' for the court and the litigants.'" *Wigler*, 108 F.R.D. at 205 (*quoting Metropolitan Life Insurance Co. v. Carr*, 169 F. Supp. 377, 378 (D. Md. 1959)). *See, e.g.*, Requests at ¶ 648 ("At all times since construction of the Ruef Natatorium, Lafayette College has had sufficient funds to pay for a raised lifeguard chair for the Natatorium"). *Compare* Fed. R. Civ. P. 36. As the College notes, many of the Requests are mirror opposites of each other. Thus, the effort in responding to one includes the effort in responding to the other. Plaintiff does not want to leave any "wiggle room," such that a technical denial by the College may not later be argued as not admitting the opposite.

The Requests for Admission are neither oppressive nor burdensome, and this Court should deny the motion.

**B.    <u>The Requests Are Not Disguised "Contention Interrogatories."</u>**

The College also objects to the Requests – and asks this Court for a protective order – on grounds that the Requests allegedly are not requests at all, but "are far more

akin to contention Interrogatories." Motion at 7. They are not. As this Court previously has recognized:

> Contention interrogatories ask a party: to state what it contends; to state whether it makes a specific contention; to state all the facts upon which it bases a contention; to take a position, and explain or defend that position, with respect to how the law applies to facts; or to state the legal or theoretical basis for a contention.

*B. Braun Medical, Inc. v. Abbott Laboratories*, 155 F.R.D. 525, 527 (E.D. Pa. 1994). *See Fidelity Deposit Co. v. McCulloch*, 168 F.R.D. 516 (E.D. Pa. 1996) (providing examples). None of the Requests, which all are simple declaratory statements, fits that definition.[7] Instead, the Requests here include:

> 471. During the fall semester of 2001, the Ruef Natatorium was not equipped with a raised lifeguard chair.
> 545. The Ruef Natatorium is part of the Allen P. Kirby Sports Complex.
> 546. The Ruef Natatorium was constructed in 1973.
> 547. At the time of the Incident, the Ruef Natatorium was a place open to the public for amateur and professional swimming.

Clearly, a request asking the College or admit or deny these facts is <u>not</u> an interrogatory asking it "to state all the facts upon which it bases a contention; to take a position, and explain or defend that position, with respect to how the law applies to facts; or to state the legal or theoretical basis for a contention." Instead, these requests, in keeping with Fed. R. Civ. P. 36, "request . . . the admission . . . of the truth of . . . matters within the scope of Rule 26(b)(1) set forth in the request that relate to statements or opinions of fact or of the application of law to fact . . . ." Their purpose, in keeping with

---

[7] Indeed, while arguing that the "Requests demonstrate a classic example of an attorney simply going through each paragraph of a Complaint and propounding a Request for admission (or 10 as in the case) for each paragraph whether it involves something at issue in the case or not," the College nowhere cites any actual examples in which a paragraph from the Complaint is reflected in a Request for Admission. This likely is because no such examples exist.

Fed. R. Civ. P. 36, "is to narrow the issues for trial to those which are <u>genuinely</u> contested." *Koprowski v. Straight Arrow Publishers, Inc.*, 1993 WL 444552, *1 (E.D. Pa.) (emphasis added). Surely there is no "genuine contest" as to the date of the construction of the Ruef Natatorium, or its location within the Allen P. Kirby Sports Complex, or even whether Jay Santarlasci was unconscious when he was removed from the pool.[8] And as to the questions regarding the timing of events that December afternoon, the College has a responsibility, under Fed. R. Civ. P. 36 to "make reasonable inquiry and secure such knowledge and information as are readily obtainable . . ." *Id.* at advisory committee notes. Given that one of the best sources for this information is its student, employee and co-Defendant, lifeguard Erin Malone, this information would appear to be "readily obtainable."

If the College truly believes that it has no liability in this case, then it should be jumping at the opportunity now before it to narrow the scope of the disputed facts and vindicate itself. Its recalcitrance speaks volumes.

### III. Conclusion

WHEREFORE, Plaintiff Elizabeth A. Stanton respectfully requests that this Court (a) deny the Motion of Lafayette College for a Protective Order and order the College to provide responses to the Requests for Admission served on it on January 9, 2003 within the time contemplated by the Rules, and (b) grant Plaintiff her costs and fees, including reasonable attorney's fees, incurred by her as a result of having to oppose Lafayette

---

[8] Indeed, the College's own students and employees reported to the College's Public Safety Office that Jay had been unconscious when he was removed from the pool.

College's motion, as well as such additional and further relief as this Court deems just and proper.

Respectfully submitted,

*Peter C. Grenier*
Peter C. Grenier (admitted *pro hac vice*)
Anne R. Noble (admitted *pro hac vice*)
BODE & GRENIER, LLP
1150 Connecticut Avenue NW
9th Floor
Washington, DC 20036
Telephone: (202) 828-4100
Fax: (202) 828-4130

-and-

Jonathan S. Ziss, Esquire
Jonathan A. Cass, Esquire
SILVERMAN BERNHEIM & VOGEL, P.C.
Two Penn Center Plaza
Philadelphia PA 19102
Telephone: (215) 636-3962
Fax: (215) 636-3999

*Counsel for Plaintiff*

# EXHIBIT "1"

# REPORT

Revised in accordance with letter dated December 27, 2002, from Ms. Anne R. Noble to comply with Federal Rule of Civil Procedure 26(a)(2).

## Stanton vs. Lafayette College, et al.

Joseph H. Santarlasci, III, was 26 years-old on December 2, 2001, when he was swimming at the Lafayette College pool. He, apparently, was doing underwater swimming and breath-holding exercises in training to be a Navy Seal. The lifeguard was dressed in jeans and a t-shirt and, apparently, was engaged in other activities in addition to watching the pool. The victim's body was accidently discovered at the bottom of the pool and retrieved in a state of apnea and asystole. His head was noted to be cyanotic. CPR was attempted at poolside, then by the police and the EMS squad but to no avail. He was transported to Easton Hospital where he, reportedly, was dead on arrival. At no time were any signs of life re-established.

At autopsy his right lung weighed 775 grams, and the left lung weighed 720 grams, approximately twice the normal weight. It was noted that there was diffuse pulmonary edema fluid throughout. There was also marked vascular congestion of the left lung. The parenchyma was dark purple-red with diffuse pulmonary edema fluid weeping from all cut surfaces. Fluid was also found in the sphenoid sinuses and cerebral edema was reported. He was noted to have mild cardiomegaly with biventricular hypertrophy. These finds are indicative of his having drowned secondary to aspiration of fresh water. Such aspiration results in absorption of hypotonic fluid with resultant hypervolemia and pulmonary edema.

The history and autopsy findings in this case are what one would expect in a case of drowning of an individual who was doing underwater endurance breath-holding swimming exercises. Although not witnessed, immediately prior to entering the water, it is reasonable to assume from the history that this individual was hyperventilating and then trying to see how long he was able to hold his breath while swimming a specific distance. It is likely the distance was determined by what was necessary to pass the entrance examination into the Navy Seals. Drowning precipitated by this mechanism has been referred to by some as shallow water blackout. Hyperventilation drives the patient's arterial carbon dioxide tension ($PaCO_2$) down to levels below the threshold for stimulating respiration; thus prolonging the period of voluntary breath-holding. Oxygen continues to be consumed, however, and the arterial oxygen tension ($PaO_2$) drops below that necessary to maintain consciousness. The victim then loses consciousness and begins to breathe in water while submerged.

Since there was no response to cardiopulmonary resuscitation, the time from onset of submersion to beginning of CPR, within reasonable medical probability, was at least five minutes, and more likely, closer to ten minutes.

It should be noted that if the victim had been rescued within three minutes of the onset of submersion, within reasonable medical probability, with appropriate rescue and resuscitation techniques, he would have regained spontaneous cardiac activity and, likely, would have survived. Furthermore, if he had been removed from the water within 1 ½ minutes, it is unlikely that he would have aspirated water and he, therefore, would have made an immediate recovery at poolside. If he was removed and appropriate resuscitative techniques were applied between three and five minutes of the onset of submersion, I would have expected his heartbeat to return. His previous practice and ability to prolong his breath-holding breaking point would have

Case 2:02-cv-04779-TON   Document 9   Filed 02/10/2003   Page 17 of 20

Page 2 of 3
Report — Stanton vs. Lafayette College, et al.

determined his neurologic outcome. However, it is noted that trained divers, e.g. the sponge divers of North Korea, have been known to have breath-held for at least four minutes without sustaining a cardiac and respiratory arrest.

In conclusion, the cause of death of Mr. Santarlasci was drowning. Within reasonable medical probability, the time from onset of submersion to rescue was, at least, five minutes and, more likely ten minutes. Had he been rescued within three minutes, within reasonable medical probability, he would have survived without residual. If he had been rescued within five minutes, although the probability of his surviving without neurologic damage would be less, it would be substantial.

## Materials Reviewed

Easton Hospital Emergency Department Records

Complaint Elizabeth A. Stanton vs. Lafayette College, et al.

Form by Emergency Response Team

Easton Police Department Report from Office of the Coroner

Keystone Intelligence Network, Inc. Report

Lafayette College Public Safety Incident Report

Lafayette College Public Safety Supplemental Reports x 4

## References for Opinions

The basis for all opinions expressed in this report can be found in the various manuscripts listed in the author's bibliography which is attached.

## Exhibits

No exhibits are anticipated to be necessary.

## Experience and Recognition of Expertise

I have had approximately 40 years of experience in performing research and treating victims of drowning incidents. At the World Congress on Drowning held in Amsterdam in June 2002, I was referred to as "The Father of Drowning" and received the Gold Medal of Honor of the Maatschappij tot Redding van Drenkelingen (The Society to Rescue People from Drowning) for my tireless efforts on this subject. This is an extremely prestigious honor which, to my knowledge, has never previously been bestowed on any American.

Page 3 of 3
Case 2:02-cv-04779-TON    Document 9    Filed 02/10/2003    Page 18 of 20
Report – Stanton vs. Lafayette College, et al.

### Curriculum Vitae and Bibliography

My curriculum vitae and bibliography are attached. It is difficult to separate into ten-year periods, therefore, it is presented in its entirety.

### Fee Schedule and Fees Billed

Enclosed is my consultation retainer agreement which lists my fees for review of material and testimony as an expert witness. As of this date, including the current report, I have billed $1,250 for review of material, consultation and report preparation.

### Listing of Cases

A listing of cases in which I have testified as an expert at trial or by deposition from 1981 to the present is enclosed. Please note that there is approximately a two-year period in which I had multiple office staff changes and although, to the best of my knowledge, the document is complete, it is possible that a couple of cases may be omitted.

_____     12/28/02
Jerome H. Modell, M.D.                Date

State of Florida

County of Alachua

Subscribed and sworn to before me on December 31, 2002, by Jerome H. Modell, M.D. known personally to me.

_____
Notary

OFFICIAL NOTARY SEAL
L KAY ESTES
COMMISSION NUMBER
DD080582
MY COMMISSION EXPIRES
JAN. 16, 2006

TOTAL P.14

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February 2003, I served, via U.S. Mail, first-class postage prepaid, PLAINTIFF'S OPPOSITION TO MOTION OF DEFENDANT LAFAYETTE COLLEGE FOR A PROTECTIVE ORDER, and the accompanying MEMORANDUM OF LAW on:

Jonathan K. Hollin, Esquire
Powell, Trachtman, Logan, Carrle,
Bowman & Lombardo
475 Allendale Road
Suite 200
King of Prussia, Pennsylvania 19406

_____
Jonathan S. Ziss, Esquire
Silverman Bernheim & Vogel
Two Penn Center Plaza, Suite 910
Philadelphia, PA 19102
215-636-3962

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ELIZABETH A. STANTON,
Personal Representative of
JOSEPH H. SANTARLASCI, III,
Deceased, and Administrator of the
Estate of JOSEPH H. SANTARLASCI, III,

    Plaintiff,

v.

LAFAYETTE COLLEGE, *et al.*,

    Defendants.

Civil Action No. 02 CV 4779

## ORDER

AND NOW this _____ day of _____, 2003, upon consideration of the Motion of Defendant Lafayette College for a Protective Order, and of Plaintiff Elizabeth A. Stanton's Opposition thereto, it is hereby **ORDERED** and **DECREED** that the Motion is **DENIED** and it is further **ORDERED** and **DECREED** that Defendant Lafayette College shall respond to Plaintiff's First Request for Admissions on or before _____, 2003; and that Defendant Lafayette College shall pay $_____, representing the costs and fees, including reasonable attorneys' fees, incurred by Plaintiff as a result of having to bring the Opposition.

                                                      BY THE COURT:

                                                      _____

                                                                      J.